**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ____________________

DAPPCENTRAL, INC., a Delaware corporation,
REX TECHNOLOGIES, GmbH, a Switzerland corporation, and
STEPHEN KING,

Plaintiffs,

v.

MARK GUAGLIARDO, and
UNITED STATES REAL ESTATE CORPORATION, a Hawaii corporation,

Defendants.

---

# COMPLAINT

---

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Dappcentral, Inc. ("Dappcentral") is a Delaware corporation with a principal place of business located at 25448 Stanley Park Road, Evergreen, Colorado. Thus, Dappcentral is deemed a citizen of the State of Delaware and the State of Colorado.

2. Plaintiff Rex Technologies, GmbH ("Rex Technologies") is Swiss corporation having its legal seat in Zug, Switzerland, and having its worldwide principal place of business located at 25448 Stanley Park Road, Evergreen, Colorado. Thus, Rex Technologies is deemed a citizen of Switzerland and Colorado.

3. Plaintiff Stephen King ("Mr. King" and collectively with Dappcentral and Rex Technologies, Plaintiffs) is an adult individual with a mailing address of 25448 Stanley Park Road, Evergreen, Colorado. Mr. King is domiciled in, and therefore a citizen of, Colorado.

4. Defendant Mark Guagliardo ("Mr. Guagliardo") is an adult individual with a business address of 1043 Makawao Ave, #110, Makwao, Hawaii 96768. Mr. Guagliardo is domiciled in, and therefore a citizen of the State of Hawaii.

5. Defendant United States Real Estate Corporation ("USREC") is a corporation organized and existing under the laws of the state of Hawaii with a registered address and, upon information and belief, a principal place of business located at 1043 Makawao Ave, #110, Makwao, Hawaii 96768. Thus, USREC is a citizen of the State of Hawaii.

6. Mr. Guagliardo is the principal owner of USREC.

7. USREC is a real estate brokerage based on the island of Maui, Hawaii.

8. As Plaintiffs are citizens of the State of Colorado or Switzerland, and the Defendants are citizens of the State of Hawaii, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332, as the parties are citizens of diverse jurisdictions and the amount in controversy exceeds $75,000.00.

9. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. §1331, as a federal question is raised.

10. This Honorable Court has personal jurisdiction over the parties pursuant to a forum selection clause contained in the Software License Agreement (as hereinafter defined).

11. Venue is also properly before this Honorable Court pursuant to the forum selection clause contained in the Software License Agreement.

**FACTUAL BACKGROUND**

12. Mr. King is former real estate entrepreneur, who, approximately ten (10) years ago, pivoted his business interests to technology and software development.

13. Mr. King is the founder and CEO of Dappcentral and Rex Technologies (collectively, the "Companies").

14. Mr. King formed the Companies to develop, own, market, sell, license and/or otherwise exploit software, with a particular focus on developing software using de-centralized "block chain" technology, that would be marketed for mainstream business and consumer use.

15. Rex Technologies was and is a holding company that would and now does own the software and other intellectual property developed by the Companies, while Dappcentral would be and is the operating entity developing, marketing, selling and licensing the technology.

16. One software program developed by the Companies is called "Imbrex," ("Imbrex"), which is a decentralized platform for real estate data akin to a block chain version of the multiple listing service, but which was intended to also contain far more extensive data with respect to real property title and sales data, and which would not be within the closed walls of existing competitors.

17. Imbrex relies upon a block chain platform with broad based potential uses developed by the Companies at a cost in excess of $2 million dollars known as "Tegula," and which once completed was "open sourced" (i.e. the code was made available for use at no cost to the public at large).

18. The bulk of the funds used to develop Tegula were raised via an "initial coin offering," which granted investors in the offering "Rex tokens," which tokens be used to purchase services on the public facing website imbrex.io.

19. Imbrex is additional software that interfaces with Tegula, and is designed for the real estate industry.

20. The Companies intended to monetize Imbrex in two ways: (a) using the website imbrex.io, a public facing website, to offer software services such as integration, data analysis, leads and market research to the real estate business community (i.e. brokerage firms, title companies, lenders, developers and investors, and (b) licensing the software to companies in the various channels of the real estate business who could operate Imbrex using their own "front end" software (i.e. the consumer/end user facing portion of the software), or, if requested and for a fee, offering configuration and/or website development services.

21. After developing Tegula as an open source produced financed through an initial coin offering, the Companies required additional capital to develop, market and sell Imbrex.

22. Mr. King ultimately invested in excess of $750,000 of his own capital into the Companies for this purpose, and also raised several hundred thousand dollars of additional capital investment from third parties.

23. In or about December 2019, Mr. King and Mr. Guagliardo became acquainted, and began to discuss their respective business interests.

24. After Mr. King shared with Mr. Guagliardo the Companies' business plan and provided further information about the Companies and Imbrex, Mr. Guagliardo expressed interest in both (a) investing in the Companies, and (b) through his brokerage firm, USREC, licensing Imbrex for the purpose of establishing a competitor to "Zillow," an online, consumer facing residential real estate marketplace.

25. Following further discussions, Mr. Guagliardo was invited to and did invest a total of $50,000 into the Companies, which investment represented a three percent (3%) equity interest in each of the Companies.

26. With respect to the proposed licensing of Imbrex, Mr. Guagliardo shared with Mr. King his own business plans and pro formas in which he claimed that he would be able to generate substantial revenue from his exploitation of Imbrex by USREC.

27. As a result, Mr. Guagliardo on behalf of USREC and Mr. King on behalf of the Companies agreed to a transaction whereby the Companies would license Imbrex to USREC in exchange for a relatively nominal one-time flat licensing fee, and a percentage of USREC's profits from its "Zillow" competitor.

28. In the course of these discussions, Mr. King made clear to Mr. Guagliardo that the Companies did not have a "white label" front end for Imbrex, and thus that USREC would have to develop its own front end, which was entirely logical given that at that point in time Imbrex intended to offer "business to business" services, not business to consumer services, and thus had made no attempt to develop a consumer facing front of this type.

29. Mr. King did, however, offer to provide USREC with the data and information necessary to allow USREC's engineers to connect the front end USREC would have to develop to Imbrex.

30. Consistent therewith, in or about March 2020, USREC and Rex Technologies entered into two contracts regarding Imbrex:

a. a Software License Agreement (the "Software License Agreement") pursuant to which Rex Technologies granted USREC a non-exclusive license to Imbrex, which USREC would market using its own "front end" software and branding in exchange for a one time license fee of Thirty-Eight Thousand and 00/100 Dollars ($38,000.00), subject to the restriction that, during the term thereof, Rex Technologies could not license Imbrex to a third party that also intended to use the same to develop a "Zillow" competitor (i.e. a consumer facing, residential real estate marketplace); and

b. a Profit Sharing Agreement (the "Profit Sharing Agreement" and collectively with the License Agreement, the "USREC Agreements") pursuant to which USREC

agreed to pay Rex Technologies ten percent (10%) of its profits from its exploitation of Imbrex as additional consideration for the license.

True and correct copies of the Software License Agreement and Profit Sharing Agreement are attached hereto as Exhibit A and Exhibit B.

31. While USREC did not return to Rex Technologies fully executed copies of either the Software License Agreement or the Profit Sharing Agreement, both orally and in emails sent to Mr. King following the conclusion of the parties negotiation of the terms thereof (the results of such negotiations being reflected in Exhibit A and Exhibit B hereto), Mr. Guagliardo confirmed USREC acceptance and entrance into both agreements. Moreover, in the defamatory communications discussed more fully below, Mr. Guagliardo also represented to a number of third parties that USREC had entered into the USREC Agreements with Rex Technologies, although in so doing he misstated at least one of the material terms thereof.

32. USREC funded the $38,000 license fee.

33. Following USREC's payment of the licensing fee, and confirmation that the USREC Agreement had been entered, Rex Technologies delivered to USREC the Imbrex code, and otherwise complied with its delivery obligations as set forth in an agreed upon Statement of Work and the License Agreement.

34. At or around this time, the Companies entered into discussions with a prominent venture capital firm, which is an affiliate of a very well-known and well capitalized real estate investment firm that subsequently branched out into other industries including venture capital

and professional sports, regarding a potential large investment into the Companies that would take the form of a combination of an equity investment and debt financing (i.e. a loan). In connection with this investment, the venture capital firm would also provide consulting services to the Companies, and make introductions to, and participate in negotiations with, prominent potential customers and/or investors on the Companies behalf with whom the venture capital firm had existing relationships.

35. The Companies ultimately entered into a binding term sheet with this venture capital firm dated April 30, 2020 pursuant to which the venture capital firm agreed to invest $1,200,000 in equity into the Companies, and would also fund or facilitate an additional approximately $7,000,000 in loans, for a total capital investment into the Companies in excess of $8,200,000.

36. At or around this time, Mr. Guagliardo began to claim that Rex Technologies had not satisfied its obligations under the License Agreement, claiming, without basis in fact, that Rex Technologies was obligated to provide USREC with “front end” software.

37. In actuality, as noted above, Rex Technologies had made clear to USREC and Mr. Guagliardo that it did not have a white label front end USREC could rebrand, and instead, had only agreed to supply Imbrex and assist USREC in coordinating the front end software it was required to develop or acquire *with* the Imbrex back end software.

38. That this was and is the extent of Rex Technologies obligations is not only set out in the License Agreement and Statement of Work, but is entirely logical: Rex Technologies did

not have a white label front end akin to "Zillow", and the cost of developing the same would likely be exponentially more than the nominal license fee paid, and was going to be the USREC's contribution to the enterprise, hence its retention of 90% of the profits, with the Companies being able to continue to exploit Imbrex in other avenues. Stated otherwise, if the Companies were going to assume the risk of all aspects of the development of this Zillow competitor, leaving only the marketing of the project to USREC, they would have either insisted upon an exponentially larger licensing fee, or the majority of the profits from the enterprise.

39. Despite the parties' obligations being indisputable, Mr. King made substantial efforts to placate Mr. Guagliardo despite his demands being without merit. Such efforts included, without limitation, offering to have the Companies engineers provide additional assistance to USREC's team in connecting their front end to Imbrex.

40. Ultimately, when it became clear that Mr. Guagliardo and USREC did not have the required engineering team and was in well over his head, and when Mr. Guagliardo continued to make outlandish threats and demands, seeking to extricate the Companies from their relationship with the clearly unsatisfied (appropriately or not) USREC, Mr. King offered to terminate the USREC Agreements and to refund USREC's licensing fees.

41. At or around this time, seemingly in an attempt to gain additional leverage in the dispute that was entirely of his own illegitimate creation and ignorance, Mr. Guagliardo also began to make a series of demands to review the Companies' records in his capacity as a shareholder, which demands were not made in accordance with Delaware or Swiss law with respect to shareholder information rights, and which ignored (a) the fact that Mr. King regularly

apprised the Companies shareholders of the Companies financials, and (b) the Companies remained a small enterprise that was pre-revenue, and whose expenses were primarily the payroll of its engineers..

42. Despite the Companies and Mr. King again placating Mr. Guagliardo by supplying him with additional financial information and documents showing that all was in order, Mr. Guagliardo then also demanded the return of his investment in the Companies, raising a number of specious claims that the Companies and/or Mr. King had breached the USREC Agreements and had, in some unexplained manner, committed fraud against Mr. Guagliardo. In making such demands, Mr. Guagliardo threatened to bring suit and/or file a criminal complaint against the Companies and/or Mr. King, and/or to defame Mr. King to specific investors or potential customers or the public at large (through alleged intentions to discuss these claims in press interviews) if the Companies and Mr. King did not immediately capitulate to Mr. Guagliardo's ever changing, but equally specious, demands.

43. In connection with these threats and demands, Mr. Guagliardo began to claim that the License Agreement granted him an exclusive license to Imbrex, despite the fact that the License Agreement plainly did not do so, and, instead, merely limited the Companies from licensing Imbrex to a third party for the purpose of also developing a "Zillow" competitor.

44. Again, in addition to the fact that Mr. Guagliardo's position was and is contrary to a plain reading of the USREC Agreements, his position that in exchange for a nominal $38,000 licensing fee, and 10% of profits (not top line revenue), the Companies had granted USREC an

exclusive license in Imbrex, which had cost the Companies north of $1 million to develop is patently absurd.

45. Fully of the belief that it was in the Companies best interest to cease doing business with Mr. Guagliardo and USREC in all respects, Mr. King agreed to return Mr. Guagliardo's investment and USREC's license fee subject only to their execution of a reasonable document terminating the USREC Agreements, relinquishing Mr. Guagliardo's equity in the Companies, and release the Companies and Mr. King from the speciously threatened claims.

46. In so doing, Mr. King made clear to Mr. Guagliardo that his claims and threats were entirely without merit, and would be vigorously dealt with if carried out, noting that Mr. Guagliardo's actions, if carried out could have serious negative consequences for the Companies, including the potential loss of the $8 million investment round that had not yet closed, and of which Mr. Guagliardo had long had actual knowledge.

47. Despite presenting Mr. Guagliardo with a fair and reasonable form of release, Mr. Guagliardo refused to execute same, while continuing to demand the immediate return of his non-refundable license fee and non-refundable investment, despite neither the Companies nor Mr. King having done anything other than honor their commitments, under the continuing specious threats of litigation and criminal referrals.

48. Mr. King was forced to disclose Mr. Guagliardo's threats and demands to the venture capital firm.

49. The venture capital firm initially remained committed to the proposed transaction, but advised that it would not fund its equity or debt investment until the situation with Mr. Guagliardo was fully resolved, and requested that Mr. King resolve the same diligently, advising that if the transaction could not move forward in relatively shortly order, the venture capital firm would be left with no choice but to terminate the binding term sheet and deploy its capital elsewhere.

50. Once again, Mr. King and the Companies confirmed their willingness to refund Mr. Guagliardo and USREC's payments/investments on terms outlined above.

51. Shortly thereafter, despite such willingness, Mr. Guagliardo proceeded to send written communications to approximately **fifty (50**) potential customers of and/or investors in the Companies containing false and defamatory statements claiming that (a) that USREC had an exclusive license to Imbrex prohibiting the Companies from licensing Imbrex or selling Imbrex as software as a service to anyone, and (b) USREC was preparing a "Fraud Lawsuit [sic.] and criminal charges against Stephen King and [the Companies] for Breach of Contract for failure to deliver a working Blockchain Real Estate and Escrow System."

52. The potential customers and investors to whom Mr. Guagliardo sent these defamatory communications were and are well known prominent real estate companies and investors throughout the nation, and represented a sizeable portion of the potential customers for Imbrex.

53. While Mr. Guagliardo may have known the *names* of some of these prospects from conversations with Mr. King, upon information and belief, Mr. Guagliardo obtained the names and *contact information* for these potential customers and/or investors, which represented all or virtually all of entries on the Companies potential customer/investor list by unlawfully accessing Mr. King and/or the Companies information technology systems.

54. As a result of Mr. Guagliardo's false and defamatory statements, the venture capital firm has exercised its right to terminate the binding term sheet without funding its investment, which has irreparably harmed the Companies.

55. Upon information and belief, Mr. Guagliardo published similar false and defamatory communications on multiple occasions, including after he was formally put on notice to cease and desist from doing so.

56. The Companies' and Mr. King's reputations have also been harmed nationally, and potentially irreparably.

57. As a result of Mr. Guagliardo's false and defamatory statements, the Companies have been unable to secure alternative investors, and their efforts to market and monetize Imbrex to these potential customers, who represent virtually all of the Companies' prospects, have also been substantially compromised.

**COUNT I – DEFAMATION**
**(Plaintiffs v. Defendants)**

58. Plaintiffs incorporate by reference each of the preceding paragraphs of this Complaint as if more fully set forth herein.

59. As discussed at length above, Mr. Guagliardo, both in his individual capacity and as an agent of USREC, published to approximately fifty (50) third parties a number of defamatory statements regarding Mr. King and the Companies by, on multiple occasions, sending written correspondence to potential investors and/or customers of the Company.

60. In particular, Mr. Guagliardo falsely alleged that he held an exclusive license to Imbrex; that the Companies were without the right to license or sell Imbrex to anyone; and that he was preparing a "Fraud Lawsuit and criminal charges against Stephen King and [the Companies] for Breach of Contract for failure to deliver a working Blockchain Real Estate and Escrow System."

61. Such statements, which contend that Mr. King and/or the Companies had not merely breached contractual obligations to USREC and/or Mr. Guagliardo, but had committed an unspecified fraud or unspecified criminal conduct, are "per se" defamatory.

62. Each of these statements were false, and, based upon the plain terms of the License Agreement, the Statement of Work and the Profit Sharing Agreement, as well as Mr. Guagliardo's prior conversations and written communications with Mr. King regarding the parties respective rights and obligations, knowingly so.

63. These false statements were also made with malice and/or with reckless disregard for their truth.

64. In fact, Mr. Guagliardo threatened to release such false and defamatory statements if the Companies and Mr. King did not capitulate to his meritless demands.

65. <u>When they did not, he published them</u>.

66. Mr. Guagliardo did so for the purpose and intent of causing harm to Mr. King and the Companies.

67. While Plaintiffs are not required to prove actual damages because Mr. Guagliardo's statements constitute defamation *per se*, Plaintiffs have suffered actual damages as a result of his publishing of the defamatory statements.

68. Specifically, as a result of Mr. Guagliardo and USREC's defamation of Mr. King and the Companies, Mr. King and the Companies have suffered substantial damages, including, without limitation, (a) the Companies loss of the $8.2 million investment from the venture capital firm pursuant to the binding term sheet, and (b) the rendering of Mr. King's investment in the Companies and his equity therein, which were valued at between $1,400,000 and $23,626,033 following the lost investment, essentially worthless.

69. In addition, such defamatory statements have caused further and additional harm and damage to Mr. King and the Companies reputation with the many other potential investors and/or customers to whom the Defendants disseminated the defamatory communications.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally, in an amount in excess of $9,600,000.00, together with punitive damages, pre-judgment and post-judgment interest thereon, attorneys' fees, costs and such other relief as the Court deems just and equitable.

**COUNT II – TORTIOUS INTEFERENCE**
**(Plaintiffs v. Mr. Guagliardo)**

70. Plaintiffs repeats and reallege each preceding and succeeding paragraph as if set forth at length herein.

71. To state a claim for tortious interference a plaintiff must allege: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

72. The Companies had an existing contractual relationship with a venture capital firm; to wit, the binding term sheet, pursuant to which such venture capital firm agreed to invest $1.2 million in equity capital and $7 million in debt capital into the Companies.

73. Mr. Guagliardo had and has actual knowledge of this agreement.

74. The Companies also had prospective contractual relationships with an identified list of potential investors and customers.

75. While Mr. King disclosed some of these potential contracting parties in conversations with Mr. Guagliardo, and while Mr. Guagliardo may have assumed the identify of some of the others because of their prominence in the real estate industry, upon information and belief, Mr. Guagliardo discovered the names of all or virtually all of the potential investors and customers on this list and their contact information by unlawfully accessing the Companies information technology systems.

76. As set forth at length above, including, as a result of Mr. Guagliardo's knowingly false contention that he held an exclusive license to Imbrex, and his falsely claiming that the Companies and/or Mr. King had committed an unspecified fraud and/or criminal conduct against

him, Mr. Guagliardo took purposeful action with the specific intent of harming the Companies existing or prospective contractual relationships.

77. By virtue of such intentional interference with Plaintiffs existing or potential contractual relationships the Companies have suffered substantial damages.

78. The actions of Mr. Guagliardo as described in detail above were willful, knowing, and done with conscious disregard of the rights of the Plaintiffs thereby entitling the Plaintiffs to an award of exemplary or punitive damages in an amount sufficient to deter the wrongful conduct set forth above in the future.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally, in an amount in excess of $9,600,000.00, together with punitive damages, pre-judgment and post-judgment interest thereon, attorneys' fees, costs and such other relief as the Court deems just and equitable.

**COUNT III – BREACH OF CONTRACT**
**(Rex Technologies v. USREC)**

79. The averments contained in the foregoing paragraphs are hereby incorporated by reference as if fully set forth at length herein.

80. The USREC Agreements constitute written contracts by and among Rex Technologies and USREC.

81. Pursuant thereto, USREC was obligated to develop a "front end" for the Imbrex software and to attempt to market and sell its "Zillow" competitor in order to generate profits, 10% of which were payable to the Companies.

82. Implied in every contract entered in this State is an implied covenant of good faith and fear dealing.

83. To the extent this Court were to conclude that USREC did not have an express obligation to develop a "front end" for the Imbrex software and to attempt to market and sell its "Zillow" competitor in order to generate profits, 10% of which were payable to the Companies, such a term must be implied into the USREC Agreements pursuant to the implied covenant of good faith and fair dealing in order to ensure that the Companies had a fair and reasonable opportunity to obtain the benefit of their bargain (i.e. licensing the Imbrex software in exchange for a modest licensing fee and 10% of USREC's profits from exploitation of Imbrex).

84. Stated otherwise, in order to give effect to the provision of the USREC Agreements pursuant to which Rex Technologies would receive 10% of USREC's profits from exploiting Imbrex, USREC was obligated to actually make an attempt to develop and exploit Imbrex as necessary to generate profits, and was vested with sole discretion as to how to develop and exploit Imbrex.

85. In breach of that obligation, USREC has utterly failed to develop a front end and/or to market and sell its "Zillow" competitors.

86. In breach of the implied covenant of good faith and fair dealing, USREC used any discretion conferred by the contact to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract by making no effort whatsoever

to develop a front end or to market and sell its "Zillow" competitor as necessary to generate profits, a portion of which were payable to Rex Technologies.

87. These actions individually and/or collectively constitute a breach of the USREC Agreement.

88. As a result of such breach, Rex Technologies has suffered substantial damages.

89. Such breaches constitute a material breach of the USREC Agreements, relieving Rex Technologies of any further performance obligation, and thus termination thereof.

WHEREFORE, Rex Technologies demands judgment in its favor and against USREC in an amount in excess of $500,000.00 together with pre-judgment and post-judgment interest, attorneys' fees, costs, a declaration that the USREC Agreements are deemed terminated, null and void, and such other relief as the Court deems just and equitable.

**COUNT IV– DECLARATORY JUDGMENT**
**(the Companies v. USREC)**
**(Asserted in the Alternative to Count III)**

90. The averments contained in the foregoing paragraphs are hereby incorporated by reference as if fully set forth at length herein.

91. The USREC Agreements constitute written contracts by and among Rex Technologies and USREC.

92. The License Agreement grants USREC a non-exclusive license to use the Imbrex software, subject only to the limitation that Rex Technologies may not license Imbrex to an

entity seeking to use it for the purpose of also developing a “Zillow” competitor (i.e. a consumer facing, residential real estate marketplace).

93. The License Agreement (and the Statement of Work) merely require Rex Technologies to give USREC access to the Imbrex software, and to provide USREC with information necessary to integrate USREC’s front end software with the Imbrex back end.

94. Contrary to a plain and unambiguous reading of the License Agreement, USREC has contended, both orally and in writing, that the License Agreement actually grants it an exclusive license to Imbrex, and further that it obligates Rex Technologies to deliver to USREC “white label” front end software, and integration services.

95. USREC has not raised this contentions to Rex Technologies in an amicable manner, but has threatened to sue Rex Technologies for breach of the License Agreement, and to also bring suit against Mr. King and/or the Companies and make a criminal referral, as a result of an unspecified fraud and/or unspecified alleged criminal conduct.

96. As noted above, Mr. Guagliardo has published these contentions to numerous third parties causing such third parties to call into question their ability to transact business with Rex Technologies based upon a fear both that Rex Technologies is without legal authorization to grant them rights in Imbrex and/or that they will become embroiled in litigation.

97. As a result, there is an actual dispute between an among the parties with respect to the meaning and intent of the License Agreement.

**WHEREFORE**, Rex Technologies demand judgment in its favor and against USREC declaring that:

A. The License Agreement does not grant USREC an exclusive license to Imbrex;

B. The License Agreement does not obligate Rex Technologies to deliver "white label" front end software for Imbrex to USREC; and

C. Rex Technologies has complied with all of its duties and obligations under the License Agreement to date and is not in breach thereof.

Together with attorneys' fees, costs, and such other relief as this Honorable Court deems just and warranted.

**COUNT V – BREACH OF CONTRACT/RESCISSION**
**(Rex Technologies v. USREC)**
**(Asserted in the Alternative to Count III and Count IV)**

98. The averments contained in the foregoing paragraphs are hereby incorporated by reference as if fully set forth at length herein.

99. The USREC Agreements constitute written contracts by and among Rex Technologies and USREC.

100. The License Agreement grants USREC a non-exclusive license to use the Imbrex software, subject only to the limitation that Rex Technologies may not license Imbrex to an entity seeking to use it for the purpose of also developing a "Zillow" competitor (i.e. a consumer facing, residential real estate marketplace).

101. USREC has contended that the License Agreement actually grants it an exclusive license to Imbrex.

102. USREC further contends that Rex Technologies was required to deliver to it "white label" front end software allowing USREC to immediately, from a technological perspective, launch its "Zillow" competitor without any technology investment, in exchange for the nominal $38,000 license fee and 10% of its profits.

103. As explained above, Rex Technologies did not, and would not have agreed to either of these terms, as, in effect, if USREC's contentions were accurate, Rex Technologies would have committed itself to a costly software build likely to cost far more than $38,000, and ceded near total control to Imbrex, which it spent more than $1,000,000 to develop, in exchange for a minor share of profits in brand new business. Such construct is thus patently absurd.

104. Thus, Rex Technologies does not believe that such contention was made in good faith, but instead, as stated above, believes that such contention was knowingly false.

105. However, should it be determined that such contention was made in good faith, then there either been a mutual mistake of fact with respect to fundamental aspects of the USREC Agreements, and/or a unilateral mistake and/or there has been no meeting of the minds.

106. In such event, it is necessary, appropriate, and just to deem the USREC Agreement rescinded, null and void.

**WHEREFORE,** Rex Technologies demands judgment in its favor declaring the USREC Agreement rescinded, null and void.

**COUNT VI - INTENTIONALLY ACCESSING A PROTECTED COMPUTER (18 U.S.C. § 1030(g)) CONSPIRACY TO INTENTIONALLY ACCESS A PROTECTED COMPUTER**
**(Plaintiffs v. Defendants)**

107. Plaintiff repeats and reasserts each of the previous paragraphs as though the same were set forth herein.

108. The Companies' information technology systems and their various internet website and applications are computer systems used in interstate and/or foreign commerce, and thus are protected computers, as such term is defined in 18 U.S.C. § 1030(e)(2)(B).

109. Upon information and belief, Mr. Guagliardo, or others under his direction, intentionally accessed the Companies' computer systems without authorization, and thereby obtained information from a protected computer; to wit, Mr. Guagliardo obtained confidential information and trade secrets, including, without limitation, the list of the Companies' prospective investors and customers by unlawfully accessing such computer systems, in violation of 18 U.S.C. § 1030(a)(2).

110. In addition, Mr. Guagliardo knowingly and with intent to defraud the Companies and extort funds from them, accessed a protected computer without authorization, and by means of such conduct furthered the intended fraud and extortion scheme by obtaining substantial items of value (i.e. list of the Companies' prospective investors and customers) in violation of 18 U.S.C. § 1030(a)(4).

111. By virtue of such unlawful access, the Companies have suffered substantial damages in excess of $8,000,000.00.

112. Pursuant to 18 U.S.C. § 1030(g) any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief.

**WHEREFORE**, the Companies demands judgment in their favor and against Ms. Guagliardo and USREC, jointly and severally, as follows:

a. for compensatory damages in an amount to be determined at trial;

b. for an award of exemplary damages;

c. for an award of reasonable attorneys' fees, post-judgment interest, costs and expenses;

d. for injunctive relief; and

e. establishing a constructive trust over the assets of Mr. Guagliardo and USREC for the benefit of the Companies.

RESPECTFULLY SUBMITTED this 19th day of March 2021.

By: *<u>/s/ Alan Schindler</u>*
Alan Schindler
TIMMINS LLC
450 East 17th Avenue, Suite 210
Denver, Colorado 80203
Tel: (303) 592-4500
Fax: (303) 592-04515
Email: as@timminslaw.com

*Attorneys for Plaintiffs Dappcentral, Inc., Rex Technologies, GmbH, and Stephen King*

<u>Plaintiffs' Address</u>
25448 Stanley Park Road
Evergreen, Colorado 80439